UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Nayelli Perez, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:20-CV-07759 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| The City of Aurora, The Village of Gilberts, and Dustin Coppes, Michael Joswick, Todd Block, and Larry Suttle, each in their individual capacity, | ) ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

The summer of 2019 was a turbulent one for Nayelli Perez. Within a few short months, she was hired by two police departments, then asked to resign from one and fired by the other. She believes that both the Aurora Police Department and the Gilberts Police Department terminated her employment in large part because her brother appeared in a gang-member database. She has sued both the City of Aurora and the Village of Gilberts, along with several police officers, under 42 U.S.C. § 1983 for interfering with her constitutional right to free association, and under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act, for employment discrimination based on her race, national origin, and sex. R. 1, Compl.[1] The City of Aurora and Defendants Dustin Coppes and Larry Suttles, both Aurora police officers (together, the Aurora Defendants or just Aurora, for simplicity's sake), have moved to dismiss the

---

[1]This Court has jurisdiction under 28 U.S.C. § 1331. Citations to the record are noted as "R." followed by the docket entry.

Complaint based on improper joinder of defendants in violation of Federal Rule of Civil Procedure 20(a)(2). R. 13, Mot. to Dismiss. For the following reasons, the motion is denied.

## I. Background

The Court accepts all well-pleaded factual allegations in the Complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiff Nayelli Perez is a Hispanic woman of Mexican descent. Compl. ¶¶ 19–21. In early July 2019, the Gilberts Police Department hired Perez as a part-time police officer. *Id.* ¶ 65. Before hiring her, Gilberts conducted a background investigation and interviewed her using a polygraph test about her criminal history. *Id.* ¶¶ 57–64. This process uncovered no criminal history. *Id.* ¶¶ 62–64. The polygraph test suggested that Perez was being truthful when she denied being involved in any gang or criminal activity over the past decade. *Id.* ¶ 61.

Perez alleges that she was doubly in the minority at the Gilberts Police Department, where most officers were white and male—indeed, Perez was the only female officer. Compl. ¶¶ 70–72. Part-time officers like Perez were permitted to hold outside employment, and some did. *Id.* ¶¶ 66–67. At least one of the other part-time officers worked fewer hours than Perez did during her employment. *Id.* ¶ 69. Perez was not informed of any specific training requirements or timeline when she was hired. *Id.* ¶ 68, 77. Instead, she was assigned to be trained by a specific officer whose work hours did not often coincide with hers. *Id.* ¶ 77. But soon after Perez was hired, Gilberts Chief of Police Michael Joswick and Deputy Chief Todd Block, as well as her

2

Field Training Officer, started asking her about her outside employment more often than they asked her colleagues similar questions. *Id.* ¶ 78. In late September, less than three months after Perez began working for the Gilberts Police Department, Joswick and Block told Perez she could either resign or be terminated. *Id.* ¶ 80. As justification, they cited her alleged failure to finish her field training hours, lack of availability to work, and outside employment, none of which should have been an issue, according to Perez. *Id.* ¶ 82. According to Gilberts records, this meeting also involved discussion of Perez's employment with the Aurora Police Department, and the allegation that her brother appeared in an Aurora Police gang database. *Id.* ¶ 84.

Perez's employment with the Aurora Police Department began and ended in August 2019. She was first recommended to be hired in mid-July, after undergoing Aurora's own criminal background check. Compl. ¶¶ 25, 29–35. This process did not reveal that Perez had a criminal history or that she or her family was affiliated with any gangs. *Id.* ¶¶ 35, 37. As in her Gilberts application process, Perez passed a polygraph test in which she expressed her belief that none of her family members were affiliated with any gangs. *Id.* ¶¶ 33–34. At the time of her hire, the Aurora Police had access to a computerized gang database showing affiliations between individuals and gangs. *Id.* ¶ 36.

Perez left another police job (separate from the Gilberts one) to accept employment with the Aurora Police Department. Compl. ¶ 39. The Aurora Police Department, like the Gilberts one, was majority male and majority white. *Id.* ¶¶ 43–44. Perez started her employment with a class of six officers, only one other of whom was a

3

woman. *Id.* ¶ 41. According to Perez, both of the newly hired women were quickly targeted for termination within their probationary period. *Id.* ¶ 42. According to Aurora, after Perez was hired, several other officers recognized her as a relative of Oscar Perez, an alleged gang member. *Id.* ¶ 46. Oscar Perez is indeed Nayelli Perez's brother, and she was living with him at the time she applied to work for Aurora. *Id.* ¶ 30. But she denies knowing at that time that he was known to be a gang member. *Id.* ¶ 47. She also says she disclosed her relationship to Oscar, his date of birth, and the fact that they lived together to the Aurora Police *before* she was hired. *Id.* ¶ 49–50. After she was hired, Aurora Police officers interviewed Perez about her brother, and she reiterated that she did not believe him to be a gang member and that he denied being one. *Id.* ¶ 51.

On August 23, 2019, about 2½ weeks after she started working for the Aurora Police Department, Perez resigned at the urging of her colleagues. Compl. ¶ 52. She met with Dustin Coppes, a Background Investigator for the Department, and Larry Suttle, a fellow officer, who presented her with two letters: a resignation letter she could sign, and a termination letter if she did not choose to resign. *Id.* They told her that her fellow officers had "voted her out" of the department. *Id.* ¶ 53. They also told her that if she were terminated, the Department would share with prospective future employers its reasons for terminating her, but that if she resigned, the Department would not tell other employers the circumstances of her resignation. *Id.* ¶ 54. Perez signed the resignation letter. *Id.* But she now believes, and alleges in her Complaint, that the Aurora Police Department shared information about the alleged reason for

forcing her to resign—specifically, her brother's alleged gang affiliation—with the Gilberts Police Department. *Id.* ¶¶ 55, 84.

Perez alleges that the Aurora Police Department's use of its Gang Database "skews heavily towards Black and Latinx at a ratio disproportionate to the racial composition of Aurora's population." Compl. ¶ 96. The Database may include individuals who simply socialize with known gang members. *Id.* ¶ 94. Meanwhile, the Database does *not* include all white gang members. *Id.* ¶¶ 96–97. The Aurora Police Department also does not fire all of the white officers whose family members have a history of criminal gang activity. *Id.* ¶ 98. The gang database has over 1,000 active entries and over 5,000 inactive ones. *Id.* ¶ 113. Perez alleges that Aurora's gang-database practices and policies have a disparate impact on Hispanic individuals and individuals of Mexican national origin. *Id.* ¶ 119. Finally, she alleges that: "The GPD adopted what it believed to be the APD's discriminatory Gang Database information to effectuate intentional racial and/or national origin discrimination against Nayelli." *Id.* ¶ 153.

Perez tried to bring her concerns about her termination from the Aurora Police Department to its Police Chief but was ignored. Compl. 56. After exhausting her administrative remedies, she filed this action. *Id.* ¶ 123.

## II. Analysis

### A. Joinder: General Principles

Perez bears the burden of demonstrating that joinder is proper under Federal Rule of Civil Procedure 20(a)(2). *See In re Veluchamy*, 879 F.3d 808, 819 n.4 (7th Cir.

2018) (applying similar Rule 19 mandatory-joinder requirement and holding that "in this Circuit the party advocating for joinder generally has the initial burden to establish the absent person's interest"); *Turley v. Gaetz*, 625 F.3d 1005, 1011 (7th Cir. 2010) (explaining that complaint in prior case had been rejected because "the plaintiff had made no effort to show how his joinder of claims satisfied Rule 20"); *Deskovic v. City of Peekskill*, 673 F. Supp. 2d 154, 159 (S.D.N.Y. 2009). "In assessing whether the requirements of Rule 20(a)(2) are met, courts must accept the factual allegations in a plaintiff's complaint as true." *Desai v. ADT Sec. Servs., Inc.*, 2011 WL 2837435, at *3 (N.D. Ill. July 18, 2011) (quoting *Deskovic*, 673 F. Supp. 2d at 159). But like the standard for evaluating a complaint under Rule 12(b)(6), courts are not required to accept conclusory or speculative statements that do not qualify as assertions of *fact. See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *cf. Arreola v. Godinez*, 546 F.3d 788, 797 (7th Cir. 2008) (explaining, for the purpose of certifying a class of plaintiffs, that "mere speculation" or "conclusory allegations" cannot support joinder); *see also, e.g.*, *Hard Drive Prods., Inc. v. Does 1–188*, 809 F. Supp. 2d 1150, 1164–65 (N.D. Cal. 2011) (severing and dismissing all but one Doe Defendant in part because the plaintiff's allegations in support of joinder were "speculative and conclusory"), *abrogated on other grounds by Williams v. King*, 875 F.3d 500, 504–05 (9th Cir. 2017).

Under Rule 20(a)(2), defendants may be joined in a single action if two requirements are satisfied: (1) the claims against them must be asserted "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences," and (2) there must be a "question of law or fact common to all defendants."

Fed. R. Civ. P. 20(a)(2)(A)–(B). To determine whether the rights asserted arise out of the same transaction or occurrence, courts must "consider the totality of the claims, including the nature of the claims, the legal basis for recovery, the law involved, and the respective factual backgrounds." *Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211*, 486 F.3d 279, 284 (7th Cir. 2007) (cleaned up).[2] Courts generally find that claims against different defendants arose out of the same transaction or occurrence only if there is a "logical relationship between the separate causes of action." *In re EMC Corp.*, 677 F.3d 1351, 1358 (Fed. Cir. 2012); *In re Price*, 42 F.3d 1068, 1073 (7th Cir. 1994) (discussing the "same transaction or occurrence" requirement in the context of Rule 13). *See also* 7 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1653 (3d ed. 2001); *Malibu Media, LLC v. John Does 1–6*, 291 F.R.D. 191, 201 (N.D. Ill. 2013). Claims have a logical relationship when there is a "substantial evidentiary overlap in the facts giving rise to the cause of action against each defendant." *In re EMC Corp.*, 677 F.3d at 1358. In other words, "[t]o be part of the same transaction requires shared, overlapping facts that give rise to each cause of action, and not just distinct, albeit coincidentally identical, facts." *Id.* at 1359 (cleaned up). *See also Malibu Media*, 291 F.R.D. at 201 ("[T]he defendants' allegedly infringing acts, which give rise to the individual claims of infringements, must *share* an aggregate of operative facts." (cleaned up)); *Eclipse Mfg. Co. v. M and M Rental Center,*

---

[2]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

*Inc.*, 521 F. Supp. 2d 739, 744 (N.D. Ill. 2007) ("[L]anguage in a number of decisions suggests that the courts are inclined to find that claims arise out of the same transaction or occurrence when the likelihood of overlapping proof and duplication in testimony indicates that separate trials would result in delay, inconvenience, and added expense ....") (cleaned up) (citing Wright and Miller)); *Magnavox Co. v. APF Elecs., Inc.*, 496 F. Supp. 29, 34 (N.D. Ill. 1980) ("The complaint ... is devoid of allegations concerning any connection between the television games [sold by the defendants], except that they are all alleged to infringe plaintiffs' patent .... Similarly, there is no indication ... that the development[,] marketing or sales efforts involving the different products are related in any way").

If a court finds that joinder does not comply with Rule 20, then the court may sever parties on its own or order that the plaintiff to cure the deficiency. *See* Fed. R. Civ. P. 21; *UWM Student Ass'n v. Lovell*, 888 F.3d 854, 863 (7th Cir. 2018). The Seventh Circuit has recognized the broad discretion that district courts have in remedying misjoinder, so long as the court's decision avoids unnecessary harm to the parties. *Chavez v. Ill. State Police*, 251 F.3d 612, 632 (7th Cir. 2001); *Elmore v. Henderson*, 227 F.3d 1009, 1012 (7th Cir. 2000). This discretion also allows courts to consider "other relevant factors in the case in order to determine whether the permissive joinder of a party will comport with the principles of fundamental fairness." *Chavez*, 251 F.3d at 632 (cleaned up). Specifically, if the joinder of multiple defendants "would create prejudice, expense or delay[,]" the district court has the discretion to disallow it. *Id.* (cleaned up).

## B. Joinder: Two Separate Police Departments

Whether Perez properly joined the Gilberts Police Department and the Aurora Police Department in the Complaint is a close call. Her claims against Gilberts and Aurora concern separate terms of employment with separate employers, and separate terminations. The Aurora Defendants' reading of the Complaint is not unreasonable, and indeed, a plaintiff increases her risk of having the Complaint misinterpreted when she files a 209-paragraph document rife with boilerplate and repetition. Aurora characterizes the Complaint as "attempting to join two separate employment discrimination claims involving two separate municipal employers into a single Complaint." R. 14, Defs.' Br. at 3. This might be true of Counts 2 through 5 if they stood alone. But in Count 1, Perez alleges that Aurora violated her constitutional rights not just by terminating her employment, but also by communicating with Gilberts, and influencing the Gilberts Police Department's actions.

Count 1 thus connects the terminations by Aurora and Gilberts, making joinder appropriate. It is important first to note that the first paragraph of the Count, Compl. ¶ 124, "realleges and incorporates by reference" all the preceding paragraphs. This standard boilerplate is not really necessary, but consideration of the entire Complaint is important on the joinder issue. Count 1 is Perez's Section 1983 claim against Aurora for interfering with her due process rights and right to intimate association. She alleges that Aurora used its gang database in a way that interfered with her relationship with her brother. *Id.* ¶¶ 124–31. The Count 1 section of the Complaint does not specifically refer to the Gilberts Police Department. But earlier in Perez's

9

Complaint, she did allege that Aurora shared information from its gang database with Gilberts. *Id.* ¶¶ 55, 84. She also alleged that that information came up in her termination meeting with Gilberts. *Id.* ¶ 84. At this stage, Perez is entitled to reasonable inferences in her favor, and a reasonable inference is that Gilberts fired Perez, at least in part, because of the Aurora Police Department's gang database and policies. This firing thus further interfered with Perez's right to associate with her brother: Aurora interfered with her right by not just firing her, but by leading the Gilberts Police Department to do the same thing. And Perez argues that Gilberts' reliance on the Aurora gang database constituted unlawful racial or national origin discrimination (or both) in violation of Title VII. *Id.* ¶¶ 144–54. In the language of Rule 20(a)(2), Perez's claims against Aurora and Gilberts thus arose out of the same "transaction, occurrence, or series of transactions or occurrences," namely, the Aurora Police Department's use of its gang database to decide to fire Perez and then to influence Gilberts into doing the same.

Along similar lines, there are several "questions of law or fact common to all defendants" as required by Rule 20(a)(2). Factually, it matters to all defendants whether the Aurora Police Department shared information from its gang database with the Gilberts Police Department; and legally, it matters to all defendants whether relying on that information to terminate Perez was a violation of her civil rights.

Another way to think of why the claims should remain joined is to consider how discovery will likely proceed in this case. Imagine that Perez were forced to drop her claims against Aurora in this suit, and she filed a new, separate suit against

Aurora. If, in that suit, she asked to depose Gilberts Police Department officials on whether they received information from Aurora about the gang database, the Court would certainly allow that deposition to take place. It would be relevant to Perez's claim against Aurora for interfering with her right to associate with her brother. And the Gilberts Police Department's counsel would undoubtedly wish to represent the Gilberts police in those depositions. So this is not the kind of case where the claims need to be separated in order to avoid "prejudice, expense or delay" for the parties—if anything, the opposite holds true. *Chavez*, 251 F.3d at 632. Keeping the claims together will likely lead to efficiencies for all parties.

It is worth noting that several of the arguments that Perez focuses on in her brief do not support joinder. She first argues that she has appropriately pled in the alternative against Gilberts and Aurora. R. 23, Pl's. Resp. at 2, 4. But that is simply wrong: her Complaint includes five separate claims against the two defendants, and none is pled in the alternative. She also contends that there is "a logical relationship between the acts of discrimination" alleged in her Complaint. *Id.* at 3. Some of the connections she cites—the timing of her employment at Aurora and Gilberts, and the proximity in time of her termination from both departments—do not support joinder standing alone. *Id.* But she comes closer to the mark when she points out that her Complaint alleges that Aurora shared its gang database information with Gilberts and that Gilberts adopted the information and policies from Aurora in terminating Perez. *Id.* at 4. Without Count 1, these connections might not support joinder; each defendant is individually responsible for its employment decisions. But Count 1,

11

though not as clearly as would be ideal, accuses Aurora of interfering with Perez's constitutional rights not just through its own actions, but also through influencing the Gilberts Police Department's actions. Perez also points out several other joint questions of law and fact, which do support joinder. *Id.* at 5–6.

But Perez then turns to an inapposite prejudice argument, asserting that joinder will not prejudice the defendants, and that their failure to raise prejudice means they have waived that argument. *Id.* 6–7. The problem for Perez is that the defendant need not show prejudice in order to have a complaint dismissed or severed for improper joinder. It is the *plaintiff's* burden, not the defendant's, to show that joinder is proper. *In re Veluchamy,* 879 F.3d at 819 n.4. And the Court has the authority to sever parties not only by motion of a party but also based exclusively on the Court's review. Fed. R. Civ. P. 21; *Wheeler v. Wexford Health Sources, Inc.*, 689 F.3d 680, 683 (7th Cir. 2012). Prejudice to either defendant is not a part of the equation under Rule 20(a), at least at the pleading stage (it is relevant when deciding whether to hold a joint trial). Still, joinder is proper in this case for the reasons already discussed.

It is important to note that keeping the case together for discovery and pretrial briefing does *not* necessarily mean that the claims against the defendants would need to be *tried* together. Ultimately the Court may decide to order separate trials to avoid prejudice to any of the defendants in front of the jury, as permitted by Federal Rule of Civil Procedure 42(b).

## III. Conclusion

The Aurora Defendants' motion to dismiss the claims against them is denied. The Defendants shall answer the Complaint by November 19, 2021. The parties shall confer and file an updated joint initial status report with proposed discovery deadlines by November 23, 2021. The tracking status hearing of November 5, 2021, is reset to December 3, 2021, at 8:30 a.m., but to track the case only (no appearance is required). Instead, the Court will review the status report and set the discovery deadlines.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 4, 2021