**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NAYELLI PEREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 1:20-CV-07759 |
| v. | ) | |
| | ) | |
| CITY OF AURORA, DUSTIN COPPES in | ) | Judge Edmond E. Chang |
| his individual capacity, and LARRY | ) | |
| SUTTLE in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Nayelli Perez sued the City of Aurora, police officer Dustin Coppes, and police sergeant Larry Suttle for discrimination on the basis of sex, race, and national origin in violation of Title VII and 42 U.S.C. § 1981. R. 1, Compl.[1] Perez also brought a Fourteenth Amendment due process claim for alleged violations of her right to intimate association under 42 U.S.C. § 1983. *Id.*[2] The Defendants now move for summary judgment. R. 140, Defs.' Mot. As explained below, the Defendants' motion is granted.

## I. Background

In deciding the Defendants' motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, Nayelli Perez.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number. Perez also sued the Village of Gilberts, Michael Joswick, and Todd Block; the Court dismissed these claims with prejudice pursuant to the parties' stipulation. R. 113, Minute Entry 10/13/22.

[2]This Court has federal-question subject matter jurisdiction under 28 U.S.C. § 1331.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Perez is female, Hispanic, and of Mexican descent. Compl. ¶¶ 19–21. She applied to be a police officer in Aurora and was hired with a start date in early August 2019. R. 142, DSOF ¶ 12; R. 143-6, Defs.' Exh. 6. As part of the application process, she completed an application form and took a polygraph test with a third-party examiner, Al Trotsky. DSOF ¶¶ 3, 6; R. 143-3, Defs.' Exh. 3; R. 143-32, Trotsky Dep. at 6, 12–13. The application form asked: "Have any of your immediate family ever had *any* past or present affiliations with street gangs" and Perez checked the box "[n]o." DSOF ¶ 7; Defs.' Exh. 3 at 11 (emphasis in original). During the polygraph test, but perhaps before Perez was connected to the polygraph,[3] Trotsky asked: "Any family members affiliated with gangs or gang members?" and Perez answered "[n]o." DSOF ¶ 4; R. 143-2, Defs.' Exh. 2 at 3. In the family references section of her application form, Perez included the names and addresses of her parents and three brothers, one of whom is Oscar Perez, and listed the same home address—542 College Avenue, Aurora, IL—for herself, Oscar Perez, and her parents. DSOF ¶ 6; Defs.' Exh. 3 at 19.

---

[3]The parties dispute whether Perez was attached to the polygraph machine when she answered this question or whether she even answered this specific question. Perez admits that Trotsky asked this question "[p]rior to the actual polygraph examination," R. 145, Pl.s' Resp. DSOF ¶ 4, but says that "the same question was not asked of Perez when she was connected to the polygraph," *id*. ¶ 5. Perez's citations do not contradict the Defendants' evidence that she was asked the question before she was attached to the machine. *See* R. 145, Pl.'s Resp. DSOF ¶ 5 (citing R. 143-31, Perez Dep. at 55–56; R. 146-2, Pl.'s Exh. A (Perez cites the Defendants' answers to questions numbers 44 and 45, which are not in this document, and no other part of the Defendants' answers address this dispute)). The parties do agree, however, that Trotsky did not detect any deception in Perez's polygraph answers. R. 154, Defs.' Resp. PSOAF ¶ 14; Trotsky Dep. at 18.

Once Perez was hired, Officer Dustin Coppes informed Sergeant Larry Suttle that he heard from gang officers in the police department that Perez's brother, Oscar, was a known gang member serving jail time, which Coppes was not aware of at the time Perez was hired. DSOF ¶ 31; R. 143-33, Suttle Dep. at 21–22. Suttle and Coppes then had a meeting with Perez on August 19 (two weeks after she joined the police department). DSOF ¶ 33; Suttle Dep. at 31. Perez testified that during the meeting, Suttle and Coppes asked if she was related to Oscar Perez, and she told them he was her brother and was currently in prison "for a charge regarding a weapon." DSOF ¶¶ 34, 36; R. 143-31, Perez Dep. at 71. Whether Perez, Suttle, and Coppes discussed the specific plea deal that resulted in prison time—possessing a firearm as a *gang* member—during this meeting is unclear. *See* Perez Dep. at 73; Suttle Dep at 38–39.[4] Suttle informed Perez that her brother Oscar was on the police department's "gang list;" Perez stated she was not aware of this because the list is not publicly available. DSOF ¶ 37; Perez Dep. at 72–73. Suttle testified that Suttle and Coppes asked Perez if she was aware of any gang affiliation her brother might have, and she said that when Oscar Perez was in high school he got in trouble for wearing gang colors (which

---

[4]Suttle testified in his deposition that he did not know at the time of the first meeting that Oscar Perez's plea deal was for possession of a firearm as a *gang* member, Suttle Dep. at 38–39, but Perez herself testified that Oscar Perez's specific plea was discussed in this meeting, Perez Dep. at 73 ("During meeting number one, isn't it correct that they advised you that your brother was in prison for possessing a firearm as a gang member? ... Yes."). Both parties agree that "Suttle and Coppes were unaware [on August 23, 2019, after the first meeting] that Oscar Perez had pled guilty with regard to a criminal charge of which he was accused." Defs.' Resp. PSOAF ¶ 20. Nevertheless, Commander Michael Doerzaph's letter dated August 23, 2019, states that Oscar Perez "was currently in prison for possessing a firearm as a gang member." R. 143-20, Defs.' Exh. 20.

of course is not necessarily the same as gang membership), and police officers came to her house for a "knock and talk" and searched her brother's bedroom. DSOF ¶ 34; Suttle Dep. at 31–32.[5] Perez stated that she did not think her brother was a gang member because she had asked him, and he said no. R. 145, Pl.'s Resp. DSOF ¶ 35; Suttle Dep. at 32; Perez Dep. at 74. Suttle, Coppes, and Perez discussed the meaning of the term "affiliation" as it was used in the application form, but Perez stated that even based on the information discussed in the meeting, she still would not answer that her brother was affiliated with a gang. DSOF ¶ 35; Suttle Dep. at 32.[6]

Sergeant Suttle then met with Commander Michael Doerzaph on the same day. DSOF ¶ 39; R. 143-19, Doerzaph Aff. ¶¶ 5, 7. Suttle informed Doerzaph that Perez stated that even considering the information they discussed, she denied her brother's gang involvement because of what her brother told her. Doerzaph Aff. ¶ 7. Doerzaph averred that "Aurora has never had an automatic employment disqualifier for an individual with a relative who has or had gang activity … but that it is a matter which needed to be included in [Perez's] background submission." *Id.* ¶¶ 11, 12. Doerzaph directed Suttle to meet with Perez again, "to explain to [her] that having a

---

[5]Perez disputes this, presumably because Perez did not testify about this exchange when asked about the August 19 meeting. Pl.'s Resp. DSOF ¶ 34 (citing Perez Dep. at 70–74).

[6]Perez disputes that she was "unclear" about the meaning of affiliation, Pl.'s Resp. DSOF ¶ 35, but Perez testified that they did discuss the meaning of "associat[ing] with" during this meeting, and Perez "stated that just because you associate with somebody doesn't mean that you're the same way" at this meeting. Perez Dep at 72.

brother who is a gang member is not a disqualifier" and "to give [her] one more op-portunity to be honest regarding her brother." *Id.* ¶ 12; Suttle Dep. at 33.[7]

On August 23, 2019, Suttle and Coppes had a second meeting with Perez. Perez testified that at this meeting, "[a]s soon as [she] went in the room, … Coppes showed [her] two letters in front of the table and he stated there was one for [her] to resign and/or one letter for [her] to get fired, and [she] told them why, and they told [her] that is because since [her] brother was on the gang list, [she] can no longer work for them." Perez Dep. at 78; *see* DSOF ¶ 50. Perez also stated that the officers told her they "wanted to let [her] go because they didn't believe that [she] answered that ques-tion [about her family gang affiliation] honestly." DSOF ¶¶ 46, 51; Perez Dep. at 79, 90. Perez told the officers that she "never denied any information" in her application, because she included Oscar Perez's name and address, and passed her polygraph, which she "answered truthfully." Perez Dep. at 78–79. Suttle testified that he and Coppes "explained the fact that having a relative that's on the gang list is not a deal breaker" and that "the issue" was that they did not believe Perez did not know about Oscar Perez's gang affiliation. Suttle Dep. at 36; *see also id.* at 46–47 ("[I]n the event that she did not admit that she knew or answered that question incorrectly, that was going to be the next step, to offer her a chance to resign in lieu of termination."). At this meeting, Perez maintained that she completed her application truthfully, and continued to deny her brother's gang affiliation. Pl.'s Resp. DSOF ¶¶ 45, 47; Perez

---

[7]Perez disputes all of the Defendants' assertions about the meeting between Suttle and Doerzaph, Pl.'s Resp. DSOF ¶¶ 39–43, but in absence of a deposition from Doerzaph or other contradicting evidence (including circumstantial evidence), the Defendants have put forward unrebutted testimony about this meeting.

5

Dep. at 88–89; Suttle Dep. at 36. Suttle and Coppes ultimately gave Perez the choice to resign or be fired by the end of the day. PSOAF ¶ 23; Suttle Dep. at 50–51. Perez signed the resignation letter during her meeting with Suttle and Coppes. DSOF ¶ 50; Perez Dep. at 91; R. 143-21, Defs.' Exh. 21.

Commander Doerzaph drafted a letter on the same day, explaining the reasons for Perez's termination in the event Perez chose not to resign. Given the importance of this letter, an extensive excerpt from it is needed:

> On August 19th it came to my attention that there was frenzied discourse amongst the officers that a new police officer, Nayelli Perez, had a brother (Oscar Perez) who was a well know[n] Latin King, and in fact was currently in prison for possessing a firearm as a gang member. This arrest was made by the Aurora Police Department on October 19th, 2017. ….
>
> Sgt. Suttle and Inv. Coppes then spoke with Nayelli. They pointed out their concerns and inquired as to her answer of "no" to question 38. She summarized that she had asked her brother directly if he was a gang member, and he told her he was not. She added that she knew her brother got in trouble when he went to East Aurora High School for gang colors. Inv. Coppes and Sgt. Suttle told her that gang officers came to her house to speak with her father about Oscar's involvement with the Latin Kings all the way back in 2008, and she nodded her head yes. They advised he had many contacts with the police department over the years including numerous arrests, and that he was currently in prison for possessing a firearm. She tried to explain that Oscar told her he was not a member, and that she read question 38 to mean specifically if she had any immediate family members who were gang *members,* misinterpreting "affiliation" to mean "member".
>
> Nayelli currently lives at 542 College Ave, the same address her brother resides when he is not locked up. She has lived with him for many many years, and to believe she was not knowledgeable to his gang involvement is simply not believable.
>
> The Aurora Police Department does not hold its applicants responsible for their family's choices. However, Nayelli was untruthful in her response to question

6

38. In addition to her untruthfulness, and especially alarming, is that she stated after meeting with Sgt. Suttle and Inv. Coppes, she would answer question 38 the same today as she did then.

R. 143-20, Defs.' Exh. 20 (emphasis in original); *see* Doerzaph Aff. ¶ 14.

Oscar Perez is named on the police department's gang list with a home address of 542 College Avenue, Aurora, IL, and Latin Kings gang affiliation. R. 152, Pl.'s Exh. 14 at 4 (sealed).[8] An Aurora Police Department "Gang Affiliation Information Sheet" dated November 11, 2008, states that Oscar Perez was wearing black and yellow at East High school, and "denied any gang affiliation" when asked about the color combination associated with the Latin Kings and why he was wearing it. R. 143-10, Defs.' Exh. 10. An "Incident Report" dated December 28, 2008, states that officers visited 542 College Ave., spoke with Oscar Perez and his father about Oscar's potential involvement with the Latin Kings street gang, and searched his room—finding "pro-Latin King graffiti, that [Oscar] denied owning or drawing." R. 143-9, Defs.' Exh. 9.[9] Perez testified that she was home during the officers' visit and knew "that back when he was in high school, there was some officers that came to [her] house… to check and see if he had anything gang related because … he was wearing some

---

[8]Although this exhibit is sealed, the cited information is not the subject of any privacy protection in Civil Rule 5.2(a) or based on any other reason.

[9]Perez disputes the admissibility of these law enforcement exhibits because they supposedly are not authenticated, Pl.'s Resp. DSOF paras. 15, 16, but given the nature of the records, the defense would be able to provide a foundation to authenticate them. Authentication is of course not the same as permitting the asserted facts contained in the records as substantive evidence of their truth, but the statements in the records are important here for their impact on the reader (that is, the decisionmaker defendants).

gang colors, … some shoes that had … yellow and black" but during the house visit "they checked everything and they didn't find anything." Perez Dep. at 26.

On May 2, 2019, Oscar Perez pleaded guilty to possession of a firearm "by a street gang member" and was sentenced to three years in prison for an arrest that occurred in October 2017. DSOF ¶ 21; R. 143-16, Exh. 16. When asked about her knowledge of these events, Perez stated she knows "that [Oscar] got pulled over with one of his friends" in October 2017 and "think[s] he took a plea." Perez Dep. at 31–32. She was living at her parents' house at the time of the arrest and stated that Oscar "was in and out of [her parents'] house, but he stayed in his girlfriend's house most of the time." *Id.* at 32. Perez also stated that after Suttle and Coppes "told [her] that [her] brother had pled guilty to a gang crime" during the August 19, 2023 meeting, she shared that information with her parents, who "were surprised" because "[t]hey just know that he pled guilty for a lesser charge, to do less time in prison but they were not aware of what was the charge." *Id.* at 76.

Perez claims that the Defendants discriminated against her on the basis of race, national origin, and sex under Title VII and Section 1981 when she was given the choice to resign or be fired. Compl. She argues that she answered her application questions honestly, and the question about family gang-member affiliation discriminates against Hispanic applicants, because the majority of the individuals on the police department's gang list are Hispanic. R. 149, Pl.'s Resp. at 7–8. She also asserts a § 1983 claim for violating her Fourteenth Amendment due process right to intimate association, for interference with her sibling relationship with Oscar Perez. *Id.* at 14–

15. The Defendants move for summary judgment because, according to them, Perez was legitimately dismissed for her perceived dishonesty.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Race and National Origin Discrimination

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); *see Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). Perez asserts both disparate-treatment and disparate-impact claims for discrimination on the basis of race and national origin. Pl.'s Resp. at 4, 8.

### 1. Disparate Treatment

Under *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), employment-discrimination plaintiffs may use a burden-shifting framework to prove Title VII disparate-treatment claims. To establish a prima facie case of discrimination, a plaintiff must offer enough evidence that: "(1) she belongs to a protected class; (2) she met Defendant's legitimate employment expectations; (3) she suffered an adverse employment action; and (4) similarly situated employees outside of her protected class were treated more favorably." *Rogers v. DeJoy*, 2021 WL 4318083, at *4 (N.D. Ill. Sept. 23, 2021); *see Gamble v. Fiat Chrysler Autos. U.S. L.L.C.*, 993 F.3d 534, 537 (7th Cir. 2021). Once the plaintiff has satisfied each element of a prima facie case, "the burden shifts to the employer to offer a non-discriminatory motive, and if the employer does

so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Gamble*, 993 F.3d at 537 (cleaned up).[10]

Or, as an available alternative to the prima facie framework, the Court must consider all relevant evidence "as a whole." *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2017). Even absent a *McDonnell Douglas* prima facie case, Perez can still defeat summary judgment if she offers enough circumstantial evidence that would allow a reasonable jury to find that she was the victim of discrimination. *Id.*; *see David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). The ultimate question is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other pro-scribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. Perez contends that there are genuine disputes of material fact when considering either the *McDonnell Douglas* or *Ortiz* standards. Pl.'s Resp. at 9.

Applying the *McDonnell Douglas* framework, it is undisputed that Perez is a member of a protected class as a Hispanic woman of Mexican descent. Compl. ¶¶ 19–21. Perez argues that she was meeting her employer's legitimate job expectations because Suttle and the Aurora Police Department had no complaints about Perez's job performance. Pl.'s Resp. at 11; Defs.' Resp. PSOAF ¶ 30; Suttle Dep. at 8, R. 148-7, Thomas Dep. at 105. Even though this is an element of the *McDonnell Douglas* analysis, the Defendants state this is a "false issue" because "[t]he City's decision did

---

[10]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

not relate to Perez's 'job performance'" and instead was "about Perez's honesty," particularly as "she had just been hired two weeks earlier, was still in training, and hadn't even started to perform." R. 155, Defs.' Reply at 11. In the absence of any argument from the Defendants construing Perez's application responses as a job *performance* issue, and viewing the facts in the light most favorable to Perez, the non-moving party, a reasonable juror could conclude that Perez was meeting her employer's legitimate expectations on the actual performance of police duties.

The Defendants next contend that there was no adverse employment action, because Perez was an at-will probationary employee who resigned and was not terminated. R. 144, Defs.' Br. at 6–7 (citing *Enslen v. Village of Lombard*, 470 N.E.2d 1188 (Ill. 1984)). But when a plaintiff is given the so-called option to resign or be fired, she has made a prima facie showing of an adverse employment action. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011) ("There is no dispute that [the plaintiff's] forced resignation constitutes an adverse employment action …."); *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) ("[W]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." (cleaned up)). Perez has adequately alleged that she suffered an adverse employment action when she was given the so-called option to resign or be terminated by the end of the day on August 23, 2019. PSOAF ¶ 23; Suttle Dep. at 50–51.

On the comparator element of the prima facie case, Perez advances three arguments that similarly situated non-Hispanic employees were treated more favorably than her. First, no Caucasian police officer has ever been fired because of a family member's criminal history. Pl.'s Resp. at 10. But the Defendants offer evidence that "Aurora has never terminated *any* police officer's employment because of a crime committed or alleged to have been committed by said individual's family, regardless of race, gender, or national origin," and Perez has not rebutted this assertion. R. 154, Defs.' Resp. PSOAF ¶ 4 (emphasis added); R. 148-1, Defs.' Answers to Interrogatories at 4.

Second, the individuals listed on the Aurora Police Department's gang list are predominantly Hispanic, and only Hispanic applicants (with the exception of one African-American applicant) have disclosed personal information about family members' gang affiliation. Pl.'s Resp. at 10; PSOAF ¶ 6; Pl.'s Exh. 14 (sealed).[11] Perez does raise legitimate questions about why applicants are questioned only about family members' *gang* affiliation, as opposed to, for example, family criminal history more generally. But the Defendants have identified five current officers—four of whom are Hispanic—who answered the family gang member question affirmatively and still were hired in the last five years. DSOF ¶¶ 56–61.[12] Even with the benefit of viewing

---

[11]This exhibit is sealed given its law-enforcement confidentiality, but the Opinion need not disclose the specifics that give rise to the confidentiality protection.

[12]Perez challenges the underlying exhibits that the Defendants cite to identify individuals who answered the family gang-member question affirmatively and were hired; Perez argues that the defense failed to certify, authenticate, and lay the foundation. Pl.'s Resp. DSOF ¶¶ 56–61. It is of course true that the Court may only consider evidence that can "be

the record in her favor, Perez has not adequately shown that having a family member on the gang list is a bar to employment, or that Hispanic applicants were treated less favorably in the application process because of this question.

Third, Perez identifies three white, male officers who were not fired despite (1) allegedly punching, elbowing, and biting someone; (2) posting a picture of a female to Instagram using a derogatory sexual slur; and (3) having at least 33 misconduct complaints. Pl.'s Resp. at 10–11.[13] A similarly situated employee (also called a comparator in legal-ese) is someone who, generally speaking, "(1) dealt with the same supervisor, (2) was subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [her] conduct or the employer's treatment of [her]." *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014) (cleaned up). It is of course true that comparators need not be identical to the plaintiff, but they must be similar enough that "the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (cleaned up). The relevant inquiry is "whether the other employees' situations

---

presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Although the Defendants could have more fully authenticated the evidence, Thomas testified about his search for officers that answered the family gang-member question, had been hired in the last five years, and were still employed by Aurora, so these exhibits could be presented in an authenticated, admissible form at trial and qualify for consideration at this summary judgment stage. *See* R. 143-37, Thomas Dep. at 66–67. The Defendants also explain that the hiring list, R. 143-26, Defs.' Exh. 26, was produced to Perez in response to her request. Defs.' Reply at 6.

[13]The Defendants admit that Brian Shields, who allegedly punched, elbowed, and bit someone, and Jonathan Olson, who posted a picture to Instagram with a derogatory sexual slur, were not fired, and state that David Brian, who had 33 misconduct complaints, resigned. Defs.' Resp. PSOAF ¶¶ 31–33.

were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva v. Wis. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019) (cleaned up).

Here, Perez has not provided any information about these proposed comparators' supervisors, whether the officers worked in similar roles as Perez, or whether Doerzaph was an involved decision-maker. *See* Pl.'s Resp. at 10–11; PSOAF ¶¶ 31–33. And none of the misconduct (as awful as some of it is) that Perez identifies is sufficiently similar to that at issue in this case. A more appropriate comparator would be an officer who answered application questions dishonestly but was not fired as a result, or someone who was dishonest while performing job duties as an officer but was not fired.

Even construing the facts in the light most favorable to Perez, she has not met her prima facie burden because of the lack of evidence that similarly situated employees outside of her protected class were treated more favorably than her. Assuming that Perez did meet this burden, however, Defendants have offered a non-discriminatory reason for Perez's discharge. The Defendants maintain that Perez was given the choice to resign or be fired because Doerzaph, who made the ultimate decision, did not believe that Perez was unaware of her brother's gang involvement and thus terminated her employment for lying on her application. Defs.' Br. at 8.

Because the Defendants have offered a non-discriminatory reason for the adverse employment action, Perez must offer enough evidence from which the jury could

find that the reason is pretextual by "present[ing] evidence suggesting that the employer is dissembling." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). "[T]he only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Ineichen v. Ameritech*, 410 F.3d 956, 961 (7th Cir. 2005) (cleaned up). "To meet this burden, [the plaintiff] must identify such weaknesses, implausibilities, inconsistencies, or contradictions in [the defendants'] asserted reason[s] that a reasonable person could find [them] unworthy of credence." *Coleman*, 667 F.3d at 852 (cleaned up). Perez tries to meet this burden by pointing out that (1) Trotsky did not find any evidence of deception in Perez's application polygraph test, (2) the gang list is not publicly available, and (3) Perez was discharged shortly after being identified as Oscar Perez's sister. Pl.'s Resp. at 11–12.

The Defendants have provided the same reason for Perez's discharge in this litigation as they did at the time of Perez's firing: in his letter dated August 23 (the day of Perez's resignation), Commander Doerzaph wrote that "to believe she was not knowledgeable to his gang involvement is simply not believable." Defs.' Exh. 20. Explaining the decision to terminate her employment, Doerzaph stated: "Nayelli was untruthful in her response to question 38. In addition to her untruthfulness, and especially alarming, is that she stated after meeting with Sgt. Suttle and Inv. Coppes, she would answer question 38 the same today as she did then." *Id.* Doerzaph was aware of the police knock and talk at Perez's house for possible gang involvement at a time when she lived there, and he knew that Oscar Perez was currently in prison for possession of a firearm by a street *gang member*. *Id.* As discussed above, Perez

denied that her brother had any gang involvement during two separate meetings with Suttle and Coppes where they discussed these events. Even construing the evidence in the light most favorable to Perez, no reasonable juror could conclude that the offered reason—that Perez was dismissed for her perceived dishonesty—was pretext and covered for race or national-origin discrimination. Even if Perez denied that Oscar Perez was a gang member or had any gang affiliation, and truly believed that he was not, Doerzaph was entitled to draw his own—non-discriminatory, reasonable—conclusions based on the information that was available to him at the time. This is not to say that Dorezaph was *correct* to conclude that Perez was lying; it is only to say that no reasonable jury could find that Dorezaph's proffered reason was a pretext for discrimination.

Perez briefly contends that the same evidence on which she relied for the prima facie case means that she survives summary judgment under *Ortiz*. Pl.'s Resp. at 12. To reiterate, that standard is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race … or other proscribed factor caused the discharge," and the evidence is "considered as a whole." *Ortiz*, 834 F.3d at 765. Perez does not make any new arguments, instead stating that the same evidence advanced under the *McDonnell Douglas* framework withstands summary judgment under *Ortiz*. Pl.'s Resp. at 12. For the reasons already explained, there is not enough evidence, considered as a whole and in the light most favorable to Perez, for a reasonable juror to conclude that Perez was discharged because she is Hispanic and of Mexican descent. It is not as if Dorezaph leapt immediately to the firing decision in a

suspicious way, or any other circumstance undermines the explanations offered by him in deciding to end Perez's employment.

## 2. Disparate Impact

"Under a disparate impact theory, an employer is held liable when a facially neutral employment practice disproportionately impacts members of a legally protected group." *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005). "A plaintiff must first show that the employment practice had an adverse impact on employees with a protected characteristic, such as race." *Downing v. Abbott Lab'ys*, 48 F.4th 793, 815 (7th Cir. 2022). If the employee makes that showing, then the burden shifts to the employer to show its employment practice "is job-related for the employee's position and consistent with business necessity." *Id.* (cleaned up) (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)).

Perez argues that the Aurora Police Department's policy of asking applicants whether they have any family members affiliated with gangs disproportionately discriminates against Hispanic applicants because the department's gang list is majority Hispanic. Pl.'s Resp. at 4–5. In addition to the sheer number of Hispanic individuals on the list, Perez alleges that the police department tracks the Latin Kings, Maniac Latin Disciples, Gangster Disciples, Ambrose, and Sureno 13 street gangs—but does not track white supremacist groups or white organized crime organizations. *Id.* at 5; Defs.' Resp. PSOAF ¶ 3; R. 148-1, Defs.' Answers to Interrogatories at 3; *see* Pl.'s

18

Exh. 14 (sealed).[14] Of those applicants whom the Aurora Police Department identified as having answered the family gang-member question affirmatively, one applicant is African-American and the rest are Hispanic. Pl.'s Resp. at 5. Perez again alleges that no Caucasian officer's employment has been terminated because of a family member's criminal history, *id.* at 7, (though, as discussed above, the Defendants state that *no* officer's employment has been terminated for this reason).

Perez also makes a statistical argument: in 2019, 365 individuals applied to the Aurora Police Department. Of the applicants, 37.8% were Hispanic and 43.6% were white. PSOAF ¶ 35; R. 151, Pl.'s Exh. 6 (sealed).[15] Of the 63 hired individuals, 28.6% were Hispanic and 60.3% were white. PSOAF ¶ 37; R. 148-8, Pl.'s Exh. 8. Perez contends that this selection rate for Hispanic applicants is less than 80% of the selection rate for white applicants and is thus evidence of adverse impact. Pl.'s Resp. at 6 (citing 29 C.F.R. § 1607.4(D)). But Perez has not connected these statistics to the specific employment policy at issue in this case. For example, Perez has not offered evidence from which to infer that Hispanic applicants' answers to the family gang-member question affect whether or not Hispanic applicants are ultimately hired. Indeed, the Defendants have offered unrebutted evidence that the answer to the family gang-

---

[14]The Defendants dispute this assertion about which gangs they track, but they themselves stated that that "Aurora does not typically deal with [white supremist groups]." Defs.' Resp. PSOAF ¶ 3. On a separate note, though this filing is sealed, the cited information does not require a redaction in this Opinion.

[15]Although this filing is sealed on the docket, the particular information cited in this Opinion need not be sealed.

member question is not necessarily outcome-determinative for applicants. *See* DSOF ¶¶ 56–61; R. 143-25–30, Defs.' Exhs. 25–30.

Although the failure to show a disproportionate impact is fatal to the disparate-impact claim, it is worth discussing the business-necessity defense. The Defendants fail to make an explicit argument on this point, only describing it in passing as a question similar to "educational background or prior employment." Defs.' Reply at 9. That said, the Defendants do provide some justification in the context of the intentional-discrimination claim. According to the Defendants, the family gang-member question is asked "so that the new officer can be counseled on the need for caution and confidentiality in dealing with sensitive issues such as the identity of undercover officers, the identity of confidential informants, and the timing and location of initiatives aimed at interdicting street gang members involved in serious criminal activity." Defs.' Br. at 10. If the concern is about how to appropriately train officers, rather than one about eligibility to be an officer, then it would seem that the question would be more appropriately asked *after* officers are hired.

Nevertheless, because no reasonable juror could conclude that Perez has shown that the Aurora Police Department's practice of asking applicants whether they have any family members that are affiliated with gangs has a disproportionate and adverse impact on individuals who are Hispanic or of Mexican descent, the Defendants are entitled to judgment as a matter of law on the disparate-impact claim.

### 3. Section 1981

Perez also asserts a § 1981 claim, which prohibits "racial discrimination in the making and enforcing of contracts." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 393 (7th Cir. 2007). This statute "does not create a private right of action against state actors," but may be enforced under 42 U.S.C. § 1983. *Campbell v. Forest Pres. Dist. of Cook Cty., Ill.*, 752 F.3d 665, 671 (7th Cir. 2014). Courts analyze § 1981 claims using the same standards as Title VII. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). So the Defendants' motion for summary judgment is granted for the same reasons as the Title VII race and national origin claims.

### B. Sex Discrimination

The *McDonnell Douglas* and *Ortiz* frameworks also apply to Perez's Title VII claim for sex discrimination. *See Joll v. Valparaiso Cmty. Schools*, 953 F.3d 923, 929 (7th Cir. 2020). To support her claim of sex discrimination, Perez cites the following statistics: 11% of the entire Aurora Police Department was female in 2019, 17% of applicants for police officer were female, and 30.3% of hired police officers were female. Pl.'s Resp. at 14; PSOAF ¶¶ 36, 38, 40; Pl.'s Exhs. 6, 8. These statistics alone do not suggest discrimination. Perez offers no details underlying the qualifications of the applicants, the applicant pool, or any other information with which to assess the meaning of the statistics. No doubt Aurora would generally hope that the ratio of male and female applicants, and the ratio of male and female hired officers, would be more in balance. But without more supporting evidence, these statistics alone are not offer for a reasonable jury to find discrimination.

Perez also points out that one other female officer was terminated during the probation period in 2019, but again she does not provide any facts about the circumstances of that termination. Pl.'s Resp. at 14. Finally, Perez references the three male officers (discussed earlier) who committed misconduct but were not fired. *Id.* These three officers are inadequate comparators for the reasons discussed above in the context of the race and national-origin claim. Perez does not otherwise try to specifically apply the *McDonnall Douglas* or the *Ortiz* standard to these facts, *see id.*, and no reasonable juror could find on the basis of these brief allegations that Perez suffered sex discrimination.

### C. Family Association

The Fourteenth Amendment protects freedom of intimate association, which is "the right to enter into and maintain certain intimate human relationships." *Montgomery v. Stefaniak*, 410 F.3d 933, 937 (7th Cir. 2005) (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 617 (1984)) (cleaned up). Under 42 U.S.C. § 1983, assuming this fundamental right is at stake—neither party briefed the specific issue—the Court must "determine whether the government has interfered directly and substantially with the plaintiffs' exercise of that right." *Christensen v. County of Boone, Il.*, 483 F.3d 454, 462 (7th Cir. 2007) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 386–87 n.12 (1978)) (cleaned up). Next, "if a fundamental right has been impaired, we ask whether the governmental action can find reasonable justification in the service of a legitimate governmental objective, or if instead it more properly is characterized as

arbitrary, or conscience shocking, in a constitutional sense." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998)) (cleaned up).

As explained above, no reasonable juror could find that Perez lost her job because Oscar Perez is her brother, so the Defendants did not interfere "directly and substantially" with Perez's family relationship. The Aurora Police Department's policy of asking applicants whether they have family members affiliated with gangs does not "rise to the level of preventing [Perez] from having a meaningful relationship," *Christensen*, 483 F.3d at 464 (cleaned up), with her brother in the absence of evidence that that question is a bar to employment.

In the context of her right to intimate association claim, Perez argues that she and her brother's family have been subject to harassment and intimidation, and that this has increased since the filing of the lawsuit. Pl.'s Resp. at 14–15; PSOAF ¶ 39. Perez's parents' declarations state that police officers pull Oscar Perez's car over "even when is not the driver," and "for suspicious reasons," so that Perez's parents now avoid riding in the same car with their son. R. 148-19, Jaime Perez Decl; Estela Perez Decl. But Jaime and Estela Perez did not provide any other details, like the timeframe, officers involved, or other information about the circumstances of these events. *See id.* During his deposition, Oscar Perez testified that he has been pulled over while driving about three times in the last two years, and that even when he is not the one driving the car, officers will ask for his name, or take him out of the car. R. 148-11, Oscar Perez Decl. at 24–26. These allegations are troubling, but Nayelli Perez—the plaintiff in this case—has not articulated how these events violate her

own constitutional right to intimate association, or even whether she has been involved in any of these interactions. *See* Pl.'s Resp. at 14–15. The Defendants' motion for summary judgment on the right to intimate association claim is thus granted.

## IV. Conclusion

Because the City of Aurora, Suttle, and Coppes have shown that they are entitled to judgment as a matter of law on the claims under Title VII, § 1981, and the right to intimate association, their motion for summary judgment is granted on all claims.

ENTERED:

s/Edmond E. Chang

Honorable Edmond E. Chang
United States District Judge

DATE: September 26, 2024